UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LISA DAVIS FOR L.H., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  4:05CV406 TIA |
| ) | |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's application for Supplemental Security Income under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## Procedural History

On October 12, 2001, Plaintiff's mother filed an application for Supplemental Security Income Benefits (SSI), alleging disability beginning September 30, 2001. (Tr. 84-86) The application was denied. (Tr. 43, 69-72) On March 3, 2003, Plaintiff and his mother testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 322-351) In a decision dated March 27, 2003, the ALJ determined that Plaintiff was not under a disability and was not eligible for Supplemental Security Income. (Tr. 18-23) On January 27, 2005, the Appeals Council denied plaintiff's request for review. (Tr. 6-8) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

At the hearing before the ALJ, both Plaintiff and his mother, Lisa Davis, testified on Plaintiff's behalf. In response to questioning by the ALJ, Ms. Davis testified that Plaintiff was 11 years old and

weighed 88 pounds. He was in the 5th grade at Cook School. Plaintiff previously attended a different elementary school but had to transfer when the school closed the self-contained class for behavioral disorders. At the time of the hearing, Ms. Davis was 30 years old and had a GED. She had some training as an assistant nurse through the Job Corps. Ms. Davis worked as an assistant manager at Lee's Chicken. The family received her wages, food stamps, and Medicaid. (Tr. 328-330, 349)

Ms. Davis testified that she believed Plaintiff should receive disability benefits based on his physical behavior. She stated that Plaintiff experienced emotional and physical outbreaks which disrupted her life and the lives of his sister and brother. According to Ms. Davis, Plaintiff mentally and physically abused himself, kids at school, and the teachers. She stated that his condition was not improving. Plaintiff saw a counselor at Hopewell Center, and they frequently called the counselor to calm down Plaintiff. At the time of the hearing, Plaintiff saw the counselor every two weeks. (Tr. 329, 331)

Plaintiff lived at home with his mother, 12-year-old brother, and 9-year-old sister. Plaintiff's relationship with his father consisted of talking on the phone. Plaintiff was not on any medication. Ms. Davis testified that since the counseling, Plaintiff was the same. Plaintiff's grades were D's and F's. He went to resource for reading and math. He performed some chores at school. Plaintiff was not involved in sports or scouts. Ms. Davis stated that he was not capable of being around other kids much, so she restricted him from activities such as sports. She explained that Plaintiff was unable to follow the rules or get along with the kids. He was kicked off the football team because he continuously conflicted with the kids. Plaintiff attended church every other Sunday. (Tr. 331-333, 342)

2

Ms. Davis testified that Plaintiff was able to dress, bathe, and feed himself. Around the house, Plaintiff kept his room clean and washed the dishes. Plaintiff played video games; however, Ms. Davis watched him closely because he would try to reconfigure the wires. Although Plaintiff rode his bike, Ms. Davis stated that he played deadly games such as racing back and forth across the street in front of oncoming traffic. He owned a helmet but only wore it occasionally. (Tr. 334-335, 341)

Plaintiff testified that she worked different shifts. During a night shift, her children stayed with her mother. Plaintiff stated that her oldest son had a learning disability and that he attended resource. Her daughter was fine. She expressed concern over Plaintiff's physical behaviors, noting that Plaintiff constantly hit his older brother even pouring a bowl of hot oatmeal on him. Ms. Davis stated that her oldest son, who was smaller than Plaintiff, had to brandish knives to protect himself. (Tr. 335-338)

Ms. Davis testified that she dated. When she went out, her oldest child went to his grandmother's house, and the younger children went to either her mother's house or stayed with their dad. Ms. Davis stated that there was a history of violence between her and Plaintiff's father, which Plaintiff witnessed several times. Ms. Davis had no contact with Plaintiff's father, and the children did not see him very often. Her daughter would report what went on at the house with regard to Plaintiff's behavioral problems. (Tr. 338-339)

Ms. Davis further testified to being called by the school three times a week. Plaintiff was either in the principal's office or another class. About seven or eight times a month, Plaintiff fought with neighborhood kids because he said they messed with him. Ms. Davis stated that Plaintiff continued to wet the bed. She reported it to her pediatrician during Plaintiff's annual check-up. However, the pediatrician had no suggestions. Ms. Davis also discussed Plaintiff's bed-wetting with his counselor. (Tr. 340-346)

The ALJ also questioned Plaintiff, who expressed disinterest in the proceedings. With regard to fighting, Plaintiff stated that the neighborhood kids would try to trip him and his brother while they played. This prompted Plaintiff to fight. Plaintiff testified that his favorite subject was Social Studies. He enjoyed playing basketball during gym. Plaintiff had no friends at school or in his neighborhood. He did not really care why. At his father's house, Plaintiff played with his dog. He stated, however, that he did not see his dad very much. Plaintiff testified that he had been in the principal's office that year for fighting. He did not fight girls, and he got along with his sister. (Tr. 346-349)

**Medical Evidence**

On March 10, 1998, Sherman Sklar, P.C., evaluated Plaintiff, who was quiet, well-mannered, and socially appropriate throughout the interview. Psychologist Sklar noted that Plaintiff did not exhibit any negative attitude or behavior. However, he also noted that Plaintiff had strong memories of violence by his father toward his mother, which was still fresh in Plaintiff's mind. Psychologist Sklar diagnosed Disruptive Behavior Disorder and a Global Assessment Functioning (GAF) score of 58. (Tr. 209-211)

On March 26, 1998, David Bailey, Psy.D., completed a Childhood Disability Evaluation Form. He noted that Plaintiff's disruptive behavior disorder was severe but did not meet or equal a listing. There was no evidence of limitations in cognitive/communicative function; motor function; personal function; or concentration, persistence, or pace. Plaintiff had less than marked limitation in social function. (Tr. 212-215)

A psychological assessment in 1999 revealed average intelligence and cognitive abilities. While Plaintiff's Second grade teacher estimated that he was functioning at the 1.5 grade level in reading, 2.0 grade level in math, and 1.5 grade level in written expression, his work habits and

4

classroom behaviors were unsatisfactory. The assessment noted that although Plaintiff's cognitive ability was normal, his achievement lagged behind his ability and jeopardized his classroom functioning and academic progress. A Bender-Gestalt Test of Visual-Motor Integration, administered to assess the presence of underlying emotional problems, revealed emotional instability. The test showed that Plaintiff's perceptual-motor developmental age fell between 5 years, 2 months, and 5 years, 3 months with a percentile rank of 1. There were 4 emotional indicators present, moderately suggesting that emotional factor may interfere with optimal performance. (Tr. 234-245)

An October 20, 1999 assessment by the Hopewell Center revealed a diagnosis of explosive disorder and a GAF of 70 as opposed to a previous GAF of 40. (Tr. 248) On that same date the Missouri Department of Mental Health diagnosed Intermittent Explosive Disorder. The examiner noted that Plaintiff exhibited out of control behavior/impulses which seriously impacted his family and social relationships as well as daily functioning due to a serious psychiatric disorder. (Tr. 249-250) On November 17, 1999, Plaintiff's teacher reported that Plaintiff had severe problems daily in all aspects of work habits and classroom behaviors. (Tr. 289)

On February 28, 2000, the St. Louis Public Schools completed an Individual Education Program ("IEP") for Plaintiff. The behavior goals for the year were for Plaintiff to accept limits set by an adult authority figure 75% of the time and to acknowledge involvement and accept consequences of his actions 75% of the time. He would attend special education for 900 minutes per week and contracted counseling for 60 minutes per week. (Tr. 216-232)

On July 10, 2000, Paul W. Rexroat, Ph.D., evaluated Plaintiff on behalf of Disability Determinations. Dr. Rexroat noted that Plaintiff appeared to function in the low average to average range of intelligence, with some indication of learning disabilities. Plaintiff's functional limitations

5

included: mild limitations in activities of daily living; marked limitations in social functioning; and marked difficulties in school functioning. Dr. Rexroat diagnosed conduct disorder; learning disorder; and a GAF of 65. (Tr. 257-260) A Childhood Disability Evaluation Form completed by David W. Bailey, Psy.D., on July 26, 2000 revealed a severe impairment that did not meet or medically equal the listings, even though Plaintiff had marked limitations in the social area. (Tr. 261-265)

Plaintiff's December 4, 2000 IEP placed him in a self-contained behavior disorder classroom for 1530 minutes per week and allotted 60 minutes per week with a contracted counselor. The school noted that Plaintiff required a self-contained setting because he threatened peers and adults; caused disturbances instead of working; refused to take responsibility for his actions; and refused to do his academic work. (Tr. 266-287)

A Teacher Questionnaire completed on December 12, 2001 noted that Plaintiff was in a self-contained behavior disorder class because of his behavior problems. Plaintiff was easily distracted and did not complete many assignments. He did not follow roles and was physically aggressive with students and disrespectful toward adults. Plaintiff hit, fought, and bullied children daily. There was no sudden worsening in Plaintiff's functioning. (Tr. 182-184)

James Reid, Ph.D., performed a consultative examination on January 14, 2002. Dr. Reid noted that Plaintiff's daily activities, appearance and ability to care for personal needs, and concentration, persistence and pace were within normal limits. Plaintiff was limited in social function because he had difficulty getting along with others. Dr. Reid diagnosed oppositional defiant disorder and a GAF of 80. Plaintiff's prognosis was good with appropriate treatment. Dr. Reid recommended that Plaintiff would benefit from highly structured settings with one-on-one supervision and immediate feedback for behaviors that were inappropriate. In addition, he suggested that Plaintiff's

mother could benefit from parent education classes. Dr. Reid noted that, if Plaintiff did not receive treatment for his behavior disorder, he was likely to show repeated episodes of deterioration. (Tr. 293-296)

Dr. Ofelia E. Gallardo completed a Childhood Disability Evaluation Form on February 13, 2002. Plaintiff's severe impairment of Oppositional Defiant Disorder did not meet or equal the listings. Plaintiff had no limitation in moving about and manipulating objects or health and physical well-being. He had less than marked limitation in caring for himself. The limitations in acquiring and using information and attending and completing tasks was less than marked. Plaintiff exhibited marked limitations in interacting and relating with others. (Tr. 298-303)

On May 20, 2002, Plaintiff attended his annual assessment at the Hopewell Center. His diagnosis was Attention Deficit Hyperactivity Disorder with a GAF of 45. The intake/screening form revealed normal appearance and behavior, as well as normal stream of though and talk. Plaintiff's insight was poor, but his judgment was fair to good. (Tr. 305-306, 311-317) Hopewell Center progress notes from December 16, 2002, June 24, 2002, January 10, 2003, and March 11, 2003 revealed Plaintiff's continued fighting in school and at home. (Tr. 307-308)

On March 11, 2003, Plaintiff's teacher completed a discipline referral, indicating that Plaintiff exhibited unsafe behavior; disrespect of teacher; disrespect of classmates; and refusal to do classwork. Specifically, the teacher noted that Plaintiff threw a book on the floor because he did not want to follow instructions. He became destructive when he didn't get his way. (Tr. 192)

## The ALJ's Determination

In a decision dated March 27, 2003, the ALJ found that Plaintiff was 12 years old and had never performed substantial gainful activity. The ALJ further found that Plaintiff and his mother, Ms.

7

Davis, were not credible witnesses with regard to the severity of Plaintiff's limitations. Plaintiff had mental impairments variably diagnosed as oppositional defiant disorder and attention deficit/hyperactivity disorder, which were severe. However, his impairments were not of the severity that medically met or equaled any impairment listed in Part B of Appendix 1 to Subpart P, 20 C.F.R. Part 404. The ALJ determined that Plaintiff had marked limitations in the interacting and relating with others area of development. However, he did not have marked or extreme limitations in any other area of functioning. Therefore, the ALJ concluded that Plaintiff was not under a disability and was not eligible for SSI under the Social Security Act. (Tr. 22-23)

## Legal Standards for Child Disability Cases

20 C.F.R. § 416.906 provides the definition for disability in children. That provision states:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

In determining disability, the ALJ must utilize a sequential evaluation process set forth in 20 C.F.R. § 416.924. The ALJ first determines whether plaintiff is doing substantial gainful activity. If so, the plaintiff is not disabled. 20 C.F.R. § 416.924(b). If the plaintiff is not working, the ALJ considers plaintiff's physical or mental impairment(s) to determine whether plaintiff has a medically determinable impairment(s) that is severe. If the impairment(s) is not medically determinable or is a slight abnormality that causes minimal limitations, the ALJ will find that plaintiff does not have a severe impairment and is not disabled. 20 C.F.R. § 416.924(c). If the impairment(s) is severe, it must meet or medically or functionally equal the listings. 20 C.F.R. § 416.924(d); see also Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853 (8th Cir. 2003) (setting forth the three-step sequential steps to

determine disability in children). The listings for mental disorders in children are contained in 20 C.F.R. Part 404, Subpart P, §§ 112.00-112.12.

Further, when determining functional limitations, 20 C.F.R. § 416.926a(a) provides that where a severe impairment or combination of impairments does not meet or medically equal any listing, the limitations will "functionally equal the listings" when the impairment(s) "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." The ALJ considers how a plaintiff functions in activities in the following six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating to others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). An impairment(s) is of listing-level severity if a plaintiff has "marked" limitations in two of the domains in paragraph (b)(1) or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not reweigh the evidence or review the record de novo. Id. (citation omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id.; Clarke v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

The ALJ may discount plaintiffs subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It

is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Id.; Ricketts v. Secretary of Health and Human Servs., 902 F.2d 661,664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

**Discussion**

Plaintiff first argues that the ALJ improperly concluded that Plaintiff's impairments did not functionally equal a listed impairment. Plaintiff further asserts that the ALJ failed to properly consider the subjective complaints and the testimony of third-parties under the Polaski standards. The Defendant, on the other hand, contends that the ALJ properly determined that Plaintiff's impairments did not functionally equal a listed impairment and properly evaluated Plaintiff's mother's testimony.

The undersigned finds that substantial evidence supports the ALJ's determination and credibility analysis. First, the ALJ properly found that Plaintiff's impairments did not functionally

---

[1] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

equal a listing because Plaintiff suffered a marked impairment in only one domain and less than marked or no impairment in the other domains. The evidence demonstrated that Plaintiff had marked limitations in interacting and relating with others. Ms. Davis testified that Plaintiff bullied his siblings and did not participate in sports because he could not get along with other children. Likewise, Plaintiff's school reported aggressive and disrespectful behavior. In addition, medical evidence from the Hopewell Center supported the determination that Plaintiff had marked limitations in the social area. (Tr. 308)

However, the evidence does not demonstrate that Plaintiff had marked limitations in any of the other domains. Plaintiff argues that the record shows marked limitations in acquiring and using information and in attending to and completing tasks. With regard to acquiring and using information, the ALJ acknowledged Ms. Davis' testimony that Plaintiff received Ds and Fs and his teacher's statement that Plaintiff's academic skills had deteriorated due to poor behavior. While this showed some limitation, the ALJ found that Plaintiff performed well academically. For instance, Dr. Reid noted that he made average grades. Plaintiff's attention and mental control were adequate; his immediate, short-term, remote, and long-term memory was intact; and he was able to understand, remember, and follow directions. (Tr. 293-296) Notes from the Hopewell Center also reflected that Plaintiff was doing well academically and that he received decent, average grades. (Tr. 308, 312) Thus, substantial evidence supports the ALJ's conclusion that Plaintiff's limitation in acquiring and using information was less than marked.

Likewise, substantial evidence also supports the ALJ's determination that Plaintiff's limitation in attending and completing tasks was less than marked. The ALJ noted that, while one teacher stated that Plaintiff had problems with concentrating, Dr. Reid noted that Plaintiff's ability to maintain

11

attention required to perform simple, repetitive tasks was within normal limits. (Tr. 296) His concentration, persistence, and pace were also within normal limits. (Tr. 295) Dr. Reid's thorough assessment indicated a GAF of 80, which reflected symptoms which were transient and expectable reactions to psychological stressors with no more than slight impairment of social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 30-32 (4th ed. 2000). While Dr. Reid indicated that in the absence of treatment, Plaintiff would likely show repeated episodes of deterioration, he also found that Plaintiff's prognosis was good with appropriate treatment. (Tr. 295-296)

Plaintiff asserts that the ALJ disregarded the Hopewell Center's diagnosis of ADHD with a GAF of 45[2], as well as Plaintiff's IEP's which reflected serious problems with concentration. However, Plaintiff's Intake/Screening form at the Hopewell Center revealed that Plaintiff was clean, neat, and coherent. He answered questions with elaboration when prompted; his content, pace, and volume were normal; and his recent and remote memories were intact. The outpatient service objectives were for Plaintiff to learn to control his anger; learn to resolve conflicts; and learn to properly respond to mood changes. Similarly, Ms. Davis reported behavior problems in school. She indicated that Plaintiff followed directions and behaved in the home and kept himself and his living area clean without prompting. (Tr. 305-316)

The undersigned agrees with Plaintiff only to the extent that this evidence shows some

---

[2] A GAF of 41 to 50 indicates "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR at 34. The undersigned notes that, unlike Dr. Reid's assessment, the Hopewell Center assessment is void of any support for this GAF score and not supported by the intake form. Further, the written report from Hopewell Center is essentially consistent with Dr. Reid's assessement.

12

limitation in attending and completing tasks. However, substantial evidence in the record supports the ALJ's determination that this limitation is less than marked. See Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (citation omitted) (even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence). Thus, the ALJ properly found that Plaintiff's impairments did not functionally equal the listing of impairments.

Next, Plaintiff argues that the ALJ improperly discredited Plaintiff's and his mother's testimonies. The undersigned disagrees. First, the ALJ found that Dr. Reid's GAF score of 80 contradicted the testimonies regarding disability. Further, the ALJ correctly noted that Plaintiff did not see a mental health professional until May, 2002, despite an alleged onset date of September, 2001. In addition, Plaintiff did not receive any mental health treatment from June, 2002 to December, 2002. Failure to seek medical care is a proper basis for discrediting a plaintiff. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). The ALJ also noted that the Hopewell Center did not prescribe medication, despite the ADHD diagnosis. A plaintiff's failure to take medication is relevant to a credibility determination. Goff v. Barnhart, 785, 793 (8th Cir. 2005 (citation omitted).

In addition, the Plaintiff contends that the ALJ erroneously relied on the consulting psychologist's assessment instead of the records from Plaintiff's treating mental health provider. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating

physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). In doing so, the ALJ must give good reasons. Id.

Here, the ALJ noted the consistencies between Dr. Reid's assessment and the Hopewell Center's reports in supporting his determination and discrediting Plaintiff's mother. Both examining sources stated that Plaintiff's memory was good; Plaintiff did well academically; and his concentration, persistence, and pace were normal. (Tr. 21) Further, the observations by the Hopewell Center are inconsistent with the GAF score of 45. Dr. Reid's evaluation, however, is extremely thorough and supports his GAF of 80 diagnosis. (Tr. 293-296) In addition, while the Plaintiff points out Dr. Reid's observation that Plaintiff would decompensate, the undersigned notes that this potential outcome was contingent on the absence of treatment. (Tr. 296) With regard to Ms. Davis' allegation regarding bed-wetting, the ALJ properly found that her failure to report these symptoms until January, 2003 indicated that the symptoms were not as severe as alleged. Again, failure to seek medical treatment is a proper basis for discrediting Plaintiff. Dukes, 436 F.3d at 928.

Further, while Plaintiff contends that the school records support the credibility of Ms. Davis, the Court notes that the most recent feedback from Plaintiff's teacher pertained primarily to aggressive and disrespectful behavior toward the teacher and other students. (Tr. 191-199) Plaintiff typically stayed on task in a "fair" manner in the mornings, but diminished to "poor" in the afternoons as a result of hitting, kicking, and chasing. (Tr. 194-197) These school records support the ALJ's determination that Plaintiff had a marked limitation in his ability to interact and relate. They do not, however, support a finding that Plaintiff had marked limitations in any other area. The undersigned therefore finds that substantial evidence supports the ALJ's credibility determination and his conclusion that Plaintiff is not under a disability.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of March, 2006.